USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 10/9/2019

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- X
NISHITA SHAH,                                                  :
                                                               :
                                    Petitioner,                :
                                                               :       19-CV-4485 (VEC)
                  -against-                                    :
                                                               :       OPINION AND ORDER
MAXWELL W. FEDERBUSH,                                          :
                                                               :
                                    Respondent.                :
------------------------------------------------------------- X

VALERIE CAPRONI, United States District Judge:

　　This case involves a family dispute about the residence of the parties' only child ("JF" or "the Child") and proves the truth of the adage that money cannot buy happiness. Petitioner and Respondent moved to New York from Thailand with the Child in August 2017 and separated ten months later. After a year navigating the separation, on May 29, 2019, Nishita Shah ("Shah") commenced this action against her husband, Max Federbush ("Federbush"), pursuant to the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, Art. 13(b), T.I.A.S. No 11670, 1343 U.N.T.S. 89, *reprinted in* 51 Fed. Reg., 10,494 (Mar. 26, 1986) ("Convention").[1] Shah seeks an order from this Court returning JF to Thailand. The petition alleges that Federbush has wrongfully retained the Child in the United States because the United States is not JF's country of habitual residence under the Convention.

　　To resolve this dispute, the Court held a five-day bench trial from August 7 to August 14, 2019. Dkts. 41-50. At the request of Federbush, the Court also ordered a child psychologist to examine JF. Dkt. 26. This case turns on just one factual issue—whether the parties intended to

---

[1] The Convention is implemented in the United States through the International Child Abduction Remedies Act, 22 U.S.C. § 9001 *et seq.* (formerly codified at 42 U.S.C. § 11601 *et seq.*).

move to the United States for a limited, two-year "trial period" or whether they moved to the United States, full stop.  Because the Court finds that the parties intended to move indefinitely—not, as Shah contends, for a trial period—Shah has not met her burden of proving that Thailand is JF's habitual residence.  Therefore, Federbush is not wrongfully retaining JF in the United States, and the petition is dismissed.

Based on observations of the witnesses, examination of the evidence, and the parties' briefing, the Court makes the following findings of fact and conclusions of law.  *See* Fed. R. Civ. P. 52(a).

## FINDINGS OF FACT

### I.     Background

Although the parties' marriage is in tatters, and they disagree on certain aspects of the history that brought them to this point, many of the salient facts are not in dispute.

Shah, a citizen of Thailand, Canada, and an overseas citizen of India, went to college in the United States and spent a year after she graduated from college in California.  Trial Transcript ("Tr.") 27:8-9, 27:22-24.  Although she is a Managing Director of her family's Thailand-based business "GP Group," she has limited decision-making and managerial powers, and her financial resources, beyond a modest salary, are controlled by her father.  Tr. 27:15, 380:23–381:15.

Federbush is a citizen of the United States.  He was raised in New York, where he attended primary school before leaving for prep school and college.  Tr. 448:23–449:25.  He works in private equity and real estate, and he has had several business ventures in Asia. Tr. 440:21-24, 450:17.  He also has close ties to a family business in New York, with which he has been intermittently involved for twenty years.  Tr. 450:16–451:3.

The parties met in Thailand in 2008, married ceremonially in Turkey in 2010, and married legally in Thailand in 2012.  Tr. 28:24–29:1, 29:25–30:4.[2]  After their ceremonial marriage, Shah became pregnant with JF.  Tr. 30:2-19.  A few months before the Child was due in spring 2012, the couple temporarily relocated from Thailand to Canada so the Child would have Canadian citizenship.  Tr. 31:9-25.  When JF was a few months old, the couple returned to Thailand, where the Child received his Thai citizenship.  Tr. 31:9-25.

The new couple lived in Bangkok for the next five years, first in an apartment purchased by Shah's parents, and then in various apartments and residences in the "family compound."  Tr. 152:6-13, 459:17–460:3.  These years were rife with marital conflict.  The parties list several stressors.  These included frustration with Shah's father, who controlled the family purse.  Tr. 39:6-11, 153:20-23, 380:23–381:15.  In addition, Federbush does not speak, read, or write Thai, nor did his visa allow him to work there.  Tr. 203:1-7, 420:18–421:11, 582:22-25.  He became listless and unhappy.  Tr. 35:24-25, 803:9.  Around 2013, Shah quit sleeping in the same bed as Federbush, and the couple argued frequently.  Tr. 35:10-25.

Notwithstanding their marital difficulties, in 2016 the parties began to contemplate moving to the United States.[3]  Initially, they discussed moving to California, where Shah had ties from college, but then they turned their sights to New York.  Tr. 155:17–156:24.  Federbush told Shah that he wanted JF to experience living in the United States, spend time with Federbush's aging parents, and attend Federbush's primary school alma mater, the Buckley School

---

[2]   According to Federbush, the marriage in Turkey was almost upended when Shah's father, in a move that was expected by neither Shah nor Federbush, presented Federbush with a prenuptial agreement right before the ceremony.  Tr. 454:6-22, 469:22–470:2.  Although Federbush declined to sign at that time, the ceremony (which was not legally binding) proceeded.  Tr. 454:23–455:2.  Ultimately, Federbush acceded to the terms of the prenuptial agreement before he and Shah were legally married in Thailand.  Tr. 455:3-18.

[3]   Federbush believed that much of the discord in their marriage arose from what he viewed as a suffocating family environment caused by a controlling patriarch in Shah's father.  Tr. 466:18–469:21, 532:12-25.

("Buckley"). Tr. 76:8-23. Shah traveled to New York in early 2016 to view apartments for purchase. Tr. 155:25–156:12, 481:6-12. Later that summer, when the family was visiting New York, they decided to apply for JF to attend Buckley. Tr. 77:3-11, 566:19–567:12. They interviewed at Buckley in August after preparing for the interview with friends at a dinner in New York. Tr. 205:11-17, 488:20–489:5. To their delight, JF was admitted in late 2016; the parties had assured Buckley that they would move to New York, enroll JF for the full eight- or nine-years boys can attend Buckley, and be a part of the school community. Tr. 77:12-13, 206:1-24, 489:22–490:25.

Soon after JF was admitted, Shah and Federbush decided to move to New York. Tr. 78:17-20, 84:3-6, 583:9-11. They leased an apartment for one year on the Upper East Side not far from Buckley and arrived in August 2017. Tr. 555:9–556:1. A month later they officially announced their move to friends and family at a large welcome party held in their honor. Tr. 198:5-25, 589:5-16; Ex. R-D.[4]

As planned, JF began kindergarten at Buckley that fall. The family was committed to integrating him at his new school. For example, in response to an assignment to bring 100 objects to school, Shah created 100 pins for JF to give to his classmates, printed with Buckley's logo and "Class of 2027." Tr. 200:11–201:18, 589:21–591:3. Although Shah and Federbush appear to have made great effort to ensure JF thrived in New York, Tr. 260:4–264:25, 584:6–585:23; Ex. R-E, they also left a deposit on file at NIST, JF's former school in Thailand, to hold his spot there in case the family returned, Tr. 95:5-25, 195:2-11; Exs. R-C, P-16.

Although Shah testified that their marriage briefly improved after the move, it soon unraveled. One new point of contention that arose after the move was that Shah could spend

---

[4] Exhibits marked R- refer to Respondent's exhibits, and those marked P- refer to Petitioner's.

only a limited number of days in the United States under the terms of her visitor's visa and before being subject to U.S. taxes—a number the couple closely tracked.[5] Tr. 81:10-16, 85:18–86:14, 87:7-23; Ex. P-11. Despite difficulties in their relationship, in early 2018 they extended the lease on their apartment for another year. Tr. 608:1-23; Ex. P-119. But during the family's 2018 summer vacation in Thailand, Shah informed Federbush that she wished to separate. Tr. 121:17-25; Ex. R-A at 26. Federbush testified that he became concerned during that trip that Shah's father was going to prevent him from bringing JF back to New York at the end of the summer holiday.[6] Tr. 916:4–917:7. Notwithstanding Federbush's concern, he and JF returned to New York before the beginning of the next school year without major incident. Shah arrived soon after; but during the fall and winter of JF's first grade year, Shah stayed in a hotel in New York rather than in the apartment where Federbush and JF lived. Tr. 125:2–126:9, 613:19–615:11.

By all accounts, their marital discord did not spill over into child rearing until fall 2018. Around that time, a dispute arose over Shah's desire to take JF to Thailand for G.P. Group's 150-year anniversary celebration, which would occur around the time of JF's Thanksgiving school break. Federbush objected based on the length of the flights, the short time JF would be on the ground in Thailand, and the fact that the trip would require him to miss some school. Tr. 137:2-16, 640:21–641:8. The parties' therapists, from whom they had begun seeking advice on how to help JF adjust to their separation, concurred with Federbush. Tr. 226:19–227:25. Federbush was

---

[5] Shah held significant assets of the family business in her name, so to avoid having to pay U.S. "global income tax," she and Federbush tracked the number of days she spent in the United States to ensure that she did not exceed approximately 180 days per year. Tr. 81:10-16, 87:7-23; Ex. P-11. Furthermore, under her visa, Shah could only spend six continuous months at a time in the United States. Tr. 87:7-8. To restart the six-month period, she needed to leave and return to the country. Tr. 287:12-17.

[6] His concerns do not appear unfounded. Shah testified that at that time her parents urged her to stay in Thailand with JF, which she declined to do. Tr. 125:21–126:21. Shah and Federbush also testified that Shah's father, at one point during the summer trip to Thailand, retained JF's passport for several days after Federbush had asked, several times, for it to be returned. Tr. 223:6–225:2, 680:20–682:4.

also nervous that if JF went to Thailand, Shah's parents would not let him return to New York. Tr. 136:18-21; Resp. ¶ 20 (Dkt. 10).

Shah acceded to Federbush's position, and JF did not attend the celebration. Arrangements for the Christmas holiday were also vexed, but this time the parties did reach an agreement. They first made plans for a trip to Thailand and prepared a stipulation that, *inter alia*, Shah would post a $1 million bond to guarantee JF's return. Tr. 149:1-3, 642:6–647:24; Resp. ¶ 20 (Dkt. 10). Instead, JF ended up splitting the holiday between his parents at various vacation spots in the United States after the parties agreed to a revised stipulation. Tr. 140:14-16, 299:13-17, 642:18-21, 644:6-21; Ex. R-S.

Around the new year, Shah moved out of the hotel and rented her own apartment in New York for a term ending in January 2020 with JF listed as an additional occupant. Tr. 267:16-22, 270:6-14. When Shah was in New York, JF (and his Thai nanny, Jum) spent time between Federbush's apartment and Shah's. Tr. 271:8-10. In the spring of 2019, Federbush told Shah (and her father) that he was registering JF for second grade at Buckley; at some point, Federbush paid JF's tuition.[7] Tr. 273:10-22, 654:12-23, 673:5-6; Ex. R-X at 1. At around the same time, in anticipation of the upcoming school year, Shah, Federbush, and JF decided that he would take French, Tr. 250:12-17, 656:20–657:22; Shah hired a math tutor whose tasks conformed to Buckley's second grade math curriculum, Tr. 284:1-8; 285:1–286:22; and Shah ordered JF's summer reading that was assigned by Buckley, Tr. 250:24–251:12; Ex. R-A at 28.

The parties continued to negotiate a permanent solution to the separation, but by late spring, the parties had hit an impasse. This lawsuit followed.

---

[7] Federbush paid JF's tuition even though Shah's father had promised to pay for all of his grandchildren's tuition and schooling until the grandchild turned thirty-five. Tr. 377:14-16, 500:11-15, 583:15-20.

## II. The Parties' Latest Shared Intent About JF's Residence

Although the facts discussed above are undisputed, the parties disagree on their understandings prior to their move to New York in August 2017. Shah asserts that the move was conditioned on a "trial period"—that if their marriage failed, they would move back to Thailand after two years. Tr. 80:25–81:9, 126:2-3, 354:1-8; Pet'r's Findings at 11 (Dkt. 39); Pet'r's Reply at 3 (Dkt. 52). Shah says she agreed to try living in New York "for the sake of peace . . . and a chance for [their] marriage to work." Tr. 78:10-16. As a result, Shah contends, the parties' last shared intent was that JF would reside in Thailand. Pet'r's Findings at 22 (Dkt. 39). Federbush disagrees. He says that the parties moved to New York without condition. He argues that the parties were, of course, aware that they might have to return to Thailand for some unforeseeable reason, but there was no condition understood by either of them that their marriage had to succeed in order for JF to remain in New York. Resp't's Findings at 19 (Dkt. 40); Resp't's Reply at 3 (Dkt. 51). Therefore, Federbush asserts that their last shared intent was for JF to reside in New York. Resp't's Findings at 22 (Dkt. 40); Resp't's Reply at 3 (Dkt. 51).

The Court does not credit Shah's testimony that the move to the United States was conditional. First, according to Shah, the condition was communicated to no one except her parents and brother.[8] Tr. 208:8–209:2. Second, Shah's description of the nature and circumstances of the condition is vague and inconsistent. Finally, although there is some evidence that corroborates her testimony, the substantial weight of the credible evidence runs counter to her narrative.

With respect to the condition itself, Shah testified that she thought returning to Thailand "might be possible" if "things [did not] work out" between her and Federbush. Tr. 375:20-24.

---

8     As discussed *infra*, her testimony is inconsistent on whether this condition was ever shared with Federbush.

She also testified that she intended to "stay for two years and [then] reassess." Tr. 81:1-9. But she also testified that they would "just go [to the United States] right now and then we'll figure it out." Tr. 374:11-21. Anticipating a mere "possibility" of return and having a plan to "reassess" their commitment to living in New York is just not the same as a condition that if the marriage failed, they (or at least she and JF) would return to Thailand. Indeed, when asked what they planned to do if the marriage was not going well after two years—the condition precedent on which she hinges her case—Shah testified that she did not know, acknowledging that "[m]aybe we never really spoke about it." Tr. 376:12-19. This admission contradicts other testimony by Shah regarding "conversations with Max before we moved that if things didn't work out that we would move back to Thailand." Tr. 353:23–354:6. What is more, Shah testified that her ideal resolution of this dispute would be custody "two weeks on and two weeks off" in New York. Tr. 362:20–363:1.[9]

Setting this problematic testimony to one side, Shah offers no persuasive evidence to corroborate her account. Shah argues that she left over ninety percent of her belongings in Thailand, that Federbush left behind the entire contents of his study, and that the parties left behind many of JF's toys. Tr. 96:1-18. But Shah and Federbush also had "stuff" in storage in New York, including Federbush's furniture and ninety-five percent of his belongings; he testified that he left in Thailand only unused files and summer clothing. Tr. 308:24–310:18, 550:7–551:16, 557:1–558:11. Further, on each subsequent trip to New York, Shah brought so much luggage that she was on one occasion stopped at the border and denied entry as an intended

---

[9] Shah counters that this was just a negotiating position and was not indicative of the absence of a condition on the move. Tr. 1200:1-3; Pet'r's Findings at 11 (Dkt. 39). The Court finds Shah's explanation to be disingenuous. If the "two weeks on, two weeks off" position were something less than Shah's professed ideal world, the Court would be more inclined to credit her testimony that it was merely a negotiating position, unrelated to her true desires. In any event, that testimony is not dispositive of whether the United States is JF's habitual residence.

immigrant. Tr. 560:5-22; Ex. R-O.[10]  Moreover, the parties took with them JF's favorite toys and weather-appropriate clothes that he had not outgrown. Tr. 558:17–559:12.

Shah also leans on the fact that the parties did not purchase real estate in New York. Tr. 101:11-23. Setting aside age-old debates over whether it is economically wiser to buy rather than rent in today's economic environment, the facts surrounding their move make their initial decision not to buy unremarkable. As a couple they had never lived in New York, and Federbush had not lived full time in New York for many years. Under those circumstances, renting rather than buying is unsurprising. Moreover, this is not a situation where there is ownership of property in one locale but not the other; Shah and Federbush also did not own an apartment in Thailand—while Shah could return to the family compound, "her" apartment was not owned by her. Tr. 101:24–102:2, 150:16–152:5, 579:13-16.

Shah also points out that Federbush maintained his Thai cell number and listed it on his business card. Tr. 849:25–850:13. And she says he kept his Thai visa and took steps to have it renewed in 2018. Tr. 858:7-23; Ex. P-24. But Federbush does not use the Thai cell number, which he keeps only for Apple's two-step verification. Tr. 850:14–851:6. And the visa, which does not allow Federbush to work in Thailand, was obtained as a matter of routine to appease Shah's father. Tr. 856:4–859:17.

Shah's mother testified that before the move to New York, Federbush told her that if things did not work out, they might be back in a year. Tr. 443:17-19. But this does little to evince an agreed-upon condition to return to Thailand. At most it evinces the mere possibility, and it does nothing to evince a *two*-year conditional period. Shah's brother testified that

---

[10] In addition to attempting to enter the country with more than 200 pounds of luggage, her belongings included a long-term lease for a New York City apartment. Tr. 307:5-20. The combination likely contributed to the initial decision to deny her entry into the country.

Federbush told him that they had allowed a two-year period to make their new lives in New York work. Tr. 515:13–517:1. But Shah's brother's testimony is just as unhelpful: even though Shah's brother identified a "two year" period, he also testified that "there was no understanding as far as [he] knew as to what would happen at the end of two years if all did not go well." Tr. 530:16–531:11.

Shah also points to the fact that they left a deposit at NIST (JF's school in Thailand) as evidence that there was no intent to move permanently to New York. When JF was not re-enrolled at NIST (because he was moving to New York), NIST asked his parents whether they would leave a deposit to facilitate JF's re-enrollment if they returned to Thailand. Federbush made his intentions clear to Shah when he texted her that there was no need to do so: "burn our boats." Tr. 195:2-11; Ex. R-C. Shah acknowledged that she did not respond or attempt to correct any misunderstanding Federbush had that this move was either permanent or indefinite, even though she testified that she understood the meaning of Federbush's "burn our boats" text. Tr. 195:5-14. The fact that a deposit was left at NIST is ambiguous at best. There was no evidence that Shah made a conscious decision to act contrary to Federbush's desire to "burn our boats." It is just as possible that Shah intended to withdraw the deposit but never got around to doing so as it is possible that she made a conscious decision to act contrary to Federbush's desire and to leave the money on deposit at NIST in case the move to New York did not work out.[11] Even if Shah consciously chose to keep the deposit at NIST in the event of some unanticipated disaster, *see* Tr. 194:1-16, 352:3-16, 542:2-13, that is not persuasive evidence that Shah intended only to move to New York for a two-year trial period. Having a back-up for an unforeseeable

---

[11] There was ample evidence that attention to details like withdrawing school deposits, paying tuition, and follow-through on child-rearing chores was not Shah's forte. *See, e.g.*, Tr. 271:11-17, 276:5-23, 350:7–351:4, 609:2–610:16, 681:1-4.

condition that *required* them to return to Thailand is far different from planning at the outset to voluntarily return if an entirely foreseeable condition (the dissolution of their marriage) came to pass.

Shah also relies on a handful of other facts that provide little support, individually or collectively, for her testimony.  The parties brought JF's Thai nanny, Jum, who had helped care for JF since his birth, to New York.  Tr. 104:7-11.  But, if anything, this evinces an intention to establish New York as their new home.  Shah testified that she maintained both her and the Child's Thai health insurance.  Tr. 97:2-14.  But the Child also has health insurance in the United States, Tr. 310:19-22, and the Thai health insurance was automatically provided by the family business controlled by her father, Tr. 98:1–99:5; Ex. P-26.  Shah testified she that did not close any of her Thai bank accounts or open any new bank accounts in the United States.  Tr. 101:10-15.  But she also admitted that she had an existing active bank account in the United States that she used when she was in New York.  Tr. 101:16-18, 312:14-23.  Finally, Shah testified that she maintained social ties to friends and family in Thailand, but one does not need to disown entirely a previous life to start unconditionally a new one elsewhere.  Tr.100:1-8, 101:11-23, 102:5-15.

Some of the facts are indicative of Shah's desire to maintain ties and perhaps even to return to Thailand, but these facts are also consistent with there having been no condition on the move.  Shah retained her business interests in Thailand and continued serving on the board of directors for two of G.P. Group's public companies.  Tr. 99:24–100:12.  Shah similarly testified that in early August 2018, during an interview with Forbes Thailand, she told the reporter that she was "going to stay in the states for two years," after which she planned to "be back in

Thailand" to look after her various Thai business interests.[12]  Tr. 131:1-9.  But that statement goes to her own connections to Thailand, not JF's.  Indeed, Shah did not testify that she told the reporter that she *and* her family would be returning in two years.[13]  And she has the demonstrated means and ability to maintain connections, including business responsibilities, in Thailand while living a life spanning two continents.

Shah also argues that she never tried to become a permanent resident or to obtain permission to work in the United States, and she never addressed the tax and business consequences that would attend permanent residency.  Tr. 86:11-17.  But permanent residency and legal working status never appeared to be a high priority given, the initial intention at least, to stay involved with the family business and to travel back-and-forth between Thailand and New York.  And Shah did not even control "her" assets; her father did.  Tr. 212:1–213:1.  Moreover, the Court finds credible Federbush's testimony that the tax day-counting arrangement was part of a longer process of addressing the tax and business consequences of permanent residence.  Tr. 591:5–595:11.  This arrangement was meant to give the Shah family a window to restructure their holdings to minimize or eliminate whatever difficulties (tax or otherwise) would arise if Shah were a permanent resident of the United States while remaining Managing Director and a substantial shareholder of GP Group.  *Id.*

In contrast to the limited quantum and persuasiveness of evidence corroborating Shah's narrative that the move to New York was conditional, there is substantial persuasive evidence that tends to corroborate Federbush's testimony that the couple moved to New York indefinitely

---

[12]  The Court notes that the published interview—with Shah, her father, and her brother—does not reflect that she made these statements.  Ex. P-113.

[13]  "I stated that we're going to stay in the states for two years, and then I plan to be back in Thailand, looking after the various business interests that we have."  Tr. 131:6-9.

and without condition.  After moving, the parties acted in ways that are entirely consistent with a shared understanding that JF would remain in New York long-term and entirely inconsistent with a shared understanding (or even a unilateral understanding) that JF was living in New York on a conditional basis.

The parties' actions with respect to Buckley all evince a mutual understanding that the move to the United States was for much longer than two years.  For example, on the 100th day of school when JF was in kindergarten, as part of an assignment that required each boy to bring 100 objects to school, Shah had 100 pins prepared, on which she had printed the Buckley logo and "Class of 2027."[14]  Tr. 200:11–201:18, 589:21–591:3.  JF brought the pins to school, where they were distributed to his classmates—other members of the "Class of 2027."  Tr. 201:5-7.  Shah testified that she meant to convey that JF was in the Class of 2027, but not necessarily Buckley's Class of 2027.  Tr. 200:24–201:22.  Because JF should complete ninth grade in 2027, because the logo of Buckley was on the pin, and because Shah provided no evidence that NIST (Shah's "back up" school in Thailand) is a K-9 school, the Court does not credit Shah's testimony on this point.  In addition, Shah and Federbush pledged to give $10,000 each to Buckley's capital campaign every year for five years in order to demonstrate their long-term commitment to the school.  Tr. 253:14–254:9, 533:9–535:11.  Even with Shah's family wealth, it strains credulity to believe that she would have made a long-term pledge to the school unless she believed JF would be attending the school long term.

After Shah notified Federbush that she wanted to separate, she behaved as though she would continue to live in New York consistently or on a periodic basis well past the August 2019

---

[14] In 2027, JF will complete ninth grade, assuming normal progress.  Buckley is one of the few private schools in New York that is a K-9 school.  Tr. 488:2-7, 590:2-5.

two-year anniversary of the move. Shah continued to count the number of days she spent in the United States to make sure she stayed under the global income-tax threshold.[15] Tr. 191:2-19. Shah rented, furnished, and moved into an apartment in Manhattan with a lease term extending to January 2020. Tr. 184:4-25, 267:16–269:25. Shah helped obtain a five-year U.S. visa for JF's nanny so that she could continue to care for him in the United States for the next five years. Tr. 192:16-21. When Shah and Federbush told JF that they were separating, they assured him that his life would not change: he would continue to live in his father's apartment and his mother would live just ten minutes away. Tr. 258:9–259:2, 621:20-23. In early 2019, Shah and Federbush created a co-parenting schedule that included the date JF would start second grade at Buckley and Shah's anticipated travel dates away from New York through November 2019. Tr. 286:23–292:13, 669:1–670:25. Shah, Federbush, and JF picked French as the foreign language JF would begin learning in second grade at Buckley. Tr. 250:12-17, 656:20–657:22. Shah and Federbush planned for JF to do Buckley's summer homework and assigned reading; JF's math tutor's assignment was based on Buckley's expectations of required math skills for second grade. Tr. 250:24–251:12, 284:1-8, 285:6–286:22; Exs. R-A at 28, R-Z at 14–15. And in April 2019, Shah considered renting an apartment in the same building as Federbush's so that a "nesting" arrangement would be possible.[16] Tr. 679:7-18.

What Shah did not do is also compelling evidence that her narrative regarding the conditional nature of the move to New York is not accurate. She did not object when Federbush

---

[15] If Shah intended to return to Thailand permanently in the summer of 2019 (as her petition suggests) and had made that decision in the summer of 2018 when she told Federbush she wanted to separate from him, counting days in 2019 would have been unnecessary as the tax authorities look at presence in the United States over a three-year look-back period. Tr. 777:15–778:1.

[16] As the Court understands it, the "nesting arrangement" would involve JF living full time in a single apartment; his parents would live with JF in that apartment when it was "their" week and would live in the other apartment in the same building when it was not. Tr. 679:11-18.

informed her of his plan to register JF for second grade at Buckley.[17]  Tr. 275:8-23, 654:12–656:12; Ex. R-X at 2–4.  She did not make alternative plans for JF to attend school in Thailand, such as inquiring whether NIST had an available seat for JF.  Tr. 377:21–378:25.  She did not tell anyone, except perhaps her parents and brother, about the conditional nature of the move (and their understanding of the condition does not entirely align with hers, as noted above).  To the contrary, she represented to Buckley, friends, family, and guests at their welcome party—effectively everyone else—that they were moving and had moved for good.[18]  Tr. 208:8–209:5.  Prior to filing the petition, Shah never asked Federbush to return JF to live in Thailand and never spoke to him about that topic.  Tr. 196:6-9.  Shah also never told JF that she planned for him to return to live in Thailand.  Tr. 202:1-3.

For these reasons, the Court finds that the last shared intent of Shah and Federbush was that JF would reside in New York, and neither Shah nor Federbush contemplated a condition, implied or explicit, that JF would return to Thailand if the parties separated.

## CONCLUSIONS OF LAW

### I. Applicable Law

The Hague Convention is "designed to 'protect children internationally from the harmful effects of their wrongful removal by establishing procedures to ensure their prompt return to the State of their habitual residence,' so that the 'rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States.'"  *Souratgar v. Lee*,

---

[17]  Federbush told Shah's father that JF's Buckley tuition was due.  Ex. R-X at 5.  As noted *supra*, her father had committed at an earlier date to pay the educational costs of JF until he was in his thirties.  Tr. 976:10-15.  The fact that her father failed to make good on his commitment suggests spite; it does not corroborate Shah's narrative.

[18]  Shah testified that she maintained such secrecy because she did not want to air their private, dirty laundry.  Tr. 168:16-22.  The Court finds this explanation weak.  It is not difficult to vaguely allude to the tentative nature of a move without disclosing the sensitive details—a line Shah appears capable of toeing.  *See* Tr. 375:22–376:3 (we're here "to figure it out").

720 F.3d 96, 101–02 (2d Cir. 2013) (quoting *Abbott v. Abbott*, 560 U.S. 1, 32 n.6 (2010) and *Chafin v. Chafin*, 568 U.S. 165, 168 (2013)). A person may exercise his or her rights under the Convention "by filing a petition for the relief sought in any court which has jurisdiction of such action and which is authorized to exercise its jurisdiction in the place where the child is located at the time the petition is filed." 22 U.S.C. § 9003(b).

The Convention is focused on the "unilateral removal or retention of children by those close to them, such as parents, guardians, or family members." *Gitter v. Gitter*, 396 F.3d 124, 129 (2d Cir. 2005) (citation omitted); *see Mozes v. Mozes*, 239 F.3d 1067, 1079 (9th Cir. 2001) ("The function of a court applying the Convention is [to determine] whether one parent is seeking unilaterally to alter the status quo with regard to the primary locus of the child's life."). Its remedy—repatriation—"is designed to preserve the status quo in the child's country of habitual residence and deter parents from crossing international boundaries in search of a more sympathetic court." *Souratgar*, 720 F.3d at 102 (quotations omitted).[19]

A petitioner bringing a Convention action for wrongful retention has the burden to prove, by a preponderance of the evidence, that "(1) the child was habitually resident in one State and has been removed to or retained in a different State; (2) the removal or retention was in breach of the petitioner's custody rights under the law of the State of habitual residence; and (3) the petitioner was exercising those rights at the time of the removal or retention." *Hofmann v. Sender*, 716 F.3d 282, 291 (2d Cir. 2013) (quoting *Gitter*, 396 F.3d at 130–31).

---

[19] Respondent filed a post-trial letter notifying the Court that Petitioner had commenced a child-custody action in Thailand sometime over the summer. Dkt. 53. Petitioner confirmed to the Court that she had done so, noting that "regardless of Petitioner's position in the Thai courts, those courts have yet to make any determination." Dkt. 55. Shah may have chosen a Thai court in which to bring her child-custody suit because she thought it would be more sympathetic to her than a New York court. Regardless, Shah's lawsuit in Thailand is irrelevant to this Court.

"[D]etermining the child's country of habitual residence is a threshold issue in nearly all Hague Convention cases." *Guzzo v. Cristofano*, 719 F.3d 100, 106 (2d Cir. 2013). The Second Circuit has stressed that habitual residence is simply the place where the child "usually or customarily lives." *Saada v. Golan*, 930 F.3d 533, 539 (2d Cir. 2019) (quoting *Guzzo*, 719 F.3d at 109). "[T]he overall assessment of habitual residence is not formulaic but instead is a fact-intensive determination that necessarily varies with the circumstances of each case." *Guzzo*, 719 F.3d at 109 (quotations omitted).

To determine habitual residence, the Second Circuit has instructed the trial court to analyze the parents' latest shared intent and, if in conflict with where the child has been retained, whether the child has nonetheless acclimatized to his or her new locale:

> First, the court should inquire into the shared intent of those entitled to fix the child's residence (usually the parents) at the latest time that their intent was shared. In making this determination the court should look, as always in determining intent, at actions as well as declarations. Normally the shared intent of the parents should control the habitual residence of the child. Second, the court should inquire whether the evidence unequivocally points to the conclusion that the child has acclimatized to the new location and thus has acquired a new habitual residence, notwithstanding any conflict with the parents' latest shared intent.

*Gitter*, 396 F.3d at 134. That is because "[f]ocusing on intentions gives contour to the objective, factual circumstances surrounding the child's presence in a given location." *Id.* at 132.

**II.     Habitual Residence**

Shah argues that JF's habitual residence is Thailand. She bases her argument on her narrative in which the family's move to New York was for a two-year trial period, conditioned on their marriage improving. Because the move was conditional, and because the condition did

not come to pass, she argues that the parties did not have a shared intent to move to New York. Thus, Shah asserts, the parties' last shared intent was that JF would reside in Thailand.[20]

Shah can prevail only if the Court credits her testimony that, from the get-go, the move to New York was conditional; but, as discussed above, the Court does not credit Shah's testimony in that regard. Shah offered inconsistent and unbelievable testimony regarding the central point of her petition—the two-year condition—and the greater weight of evidence supports Respondent's narrative that the parties intended to move to New York indefinitely.

This is not a case, as Petitioner contends, where an "unmet condition precedent" precludes shared intent. *Hofmann*, 716 F.3d at 292. For one, Petitioner and Respondent certainly have not "specifically and persuasively testified to their shared understanding of [the condition]." *Id.* at 287. But even granting leeway for a possible implied condition—in either Shah's mind or both of their minds—the Court still does not find one. In *Mota v. Castillo*, a case on which Petitioner relies heavily, the father traveled to the United States from Mexico with the child illegally, and the mother's attempt to join them was thwarted when she was caught and deported. 692 F.3d 108, 110–11 (2d Cir. 2012). When the father did not return with the child to Mexico, the mother filed a petition under the Convention. *Id.* at 111. The Second Circuit inferred a condition into their decision to move to New York that the mother would be able to join them. *Id.* at 115. In contrast, Shah and Federbush moved to New York—legally and in tandem—to establish a life for their family, including JF.

Petitioner also relies on *Ermini v. Vittori*, but the family's move to the United States in that case was motivated and designed entirely "for the purpose of obtaining [medical] treatment

---

[20] It is not completely clear whether Shah argues that only she believed the move was conditional or that she and Federbush had a mutual understanding that it was conditional. Either way, her position does not hold.

for [the child]." 2013 WL 1703590, at *11 (S.D.N.Y. Apr. 19, 2013), *aff'd as amended*, 758 F.3d 153 (2d Cir. 2014). Indeed, the Convention "does not concern itself with situations," like this one, "where two parents commit to settle a family in a new location, and where in so migrating, neither parent breaches the other's custody rights. Familial migration across borders is a facet of family life for many." *Ermini v. Vittori*, 758 F.3d 153, 161 (2d Cir. 2014).[21]

Although Shah may have hoped that they would consider returning to Thailand if their marriage did not work out (the Court is not persuaded that Shah believed Federbush would ever return to Thailand), habitual residence is not determined by "wishful thinking alone." *Mozes*, 239 F.3d at 1078. "When the child moves to a new country accompanied by both parents, who take steps to set up a regular household together, the period need not be long [to establish a new habitual residence]." *Id.* The parties both intended that JF would reside in New York. The parties moved there together. And the parties established a locus of family life, schooling, friends, possessions, and expectations in New York. New York, by all indications—including the parties' last shared intent—is where the Child usually and customarily lives.

In short, Petitioner has failed to satisfy her burden of proving, by a preponderance of the evidence, that Thailand is JF's habitual residence.[22]

---

[21] The other cases upon which Petitioner relies are likewise factually inapposite because they involved conditional moves with persuasive evidence of the existence of the conditions. They do not warrant further discussion here.

[22] Because the Court concludes that Petitioner has not satisfied her burden of proving that JF's habitual residence is *not* the United States, it is unnecessary to discuss the other issues that the parties have raised. Contrary to Petitioner's argument, Respondent is not arguing that JF "abandoned" Thailand. He argues that the family moved to the United States and established New York as JF's new habitual residence—which necessarily implies abandonment of one habitual residence for another, as the evidence in this case bears out. While it is clear that in a lay sense JF is very much "acclimatized" to New York, the Court also does not need to determine whether the child has acclimated to the United States as that term is used in Convention cases, because there is no conflict with the parents' latest shared intent. *See Guzzo v. Cristofano*, 719 F.3d 100, 103 (2d Cir. 2013). For the same reasons, the Court need not consider Respondent's affirmative defenses.

## CONCLUSION

For the foregoing reasons, the petition is DENIED. All provisional remedies previously ordered by this Court are TERMINATED. *See* 22 U.S.C. § 9004(a); Dkt. 12. The Court respectfully directs the Clerk of the Court to enter judgment in favor of Respondent and close this case.

**SO ORDERED.**

**Date: October 9, 2019**
**New York, NY**

_____
**VALERIE CAPRONI**
**United States District Judge**